FILED

2014 Dec-19  PM 04:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MICHAEL THOMAS** | ) | |
| **STAINBACK a/k/a** | ) | |
| **BILL THOMAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:13-CV-812-KOB** |
| | ) | |
| **CITADEL BROADCASTING** | ) | |
| **COMPANY CORP. and** | ) | |
| **CUMULUS MEDIA, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

*It's so sweet, I feel like my teeth are rotting when I listen to the radio.*
                                        -Bono

When he made that comment, Bono obviously was not listening to Paul Finebaum.   In

2011-2012, the time of the events chronicled in this lawsuit, Finebaum reigned as the uncivil host

of *The Paul Finebaum Radio Network* on WJOX, a central part of the Alabama radio markets of

the Defendants, the Citadel Broadcasting Company Corporation and Cumulus Media, Inc.  In a

state where football is akin to religion, with all of the accompanying emotional fervor,

Finebaum's radio show was a venue for rival fans of Auburn University and the University of

Alabama to "duke it out" verbally, with Finebaum finessing and coaxing out tempers and

ensuring that at least half of the listeners were profoundly irritated.  In February of 2011,

Alabama fan Harvey Updyke called the show under a pseudonym and confessed to poisoning the

1

Toomer's Corner trees revered by Auburn fans, hardly the saccharine stuff to ruin Bono's teeth.

Behind the scenes, the Alabama radio market was not all sweetness and light, either.  Finebaum

filed a lawsuit against his employer, Defendant Citadel, a company that Defendant Cumulus later

acquired, and against the Defendants' Market Manager, Plaintiff Michael Thomas Stainback,

who uses the name "Bill Thomas" in the radio industry.   Finebaum's claims are not part of the

federal lawsuit before this court, and his lawsuit only serves as a backdrop to it.  However, if

Plaintiff Thomas is to be believed, the Defendants were hatching a different toxic scheme to

discriminate against Thomas because of his heart condition, but were hiding discrimination under

the term "consolidation."  Such is the stuff that nightmares and lawsuits are made on, and the

Defendants' Alabama radio markets were in the midst of this legal tempest.

 Hence, Thomas filed this employment discrimination case, brought pursuant to the

American with Disabilities Act as amended, which is now before the court on "Defendants'

Motion for Summary Judgment."  (Doc. 35).  Thomas filed a response (doc. 36), and Defendants

followed with a reply (doc. 42); this matter has received thorough briefing.  For the reasons

stated in this Memorandum Opinion, the court FINDS that the motion is due to be DENIED.

## PROCEDURAL BACKGROUND

On April 30, 2013, Thomas filed this discrimination suit against his employers,

Defendants Citadel and Cumulus, the latter of which had acquired Citadel in 2011.   The

Complaint (doc. 1) originally contained two counts: Count One, asserting Disability

Discrimination in unlawfully terminating Thomas; and Count Two, asserting Retaliation.  After

Thomas filed a motion to dismiss Count Two with prejudice  (doc. 23), the court granted the

motion, dismissing Count Two (doc. 24).  Accordingly, the claim for disability discrimination

based on termination is the only claim that remains.

## FACTS

The court views the facts in the light most favorable to Thomas.  Thomas disputes 20 out of Defendants' 27 "undisputed" facts, and Defendants dispute 10 of Thomas's statement of 15 additional facts.

### *Thomas's Medical History Prior to Citadel Employment*

On December 9, 2009, Thomas had a heart attack resulting in heart scarring, and he received a heart catherization and stents in heart arteries.  He went through cardiac rehabilitation for several months after the heart attack.   On March 23, 2010, after the rehabilitation process, Defendant Citadel hired Thomas as its Birmingham Market Manager.

According to Thomas, his heart functions at approximately 40 percent capacity since the heart attack.

### *Thomas's Employment with Citadel*

Thomas worked for Citadel and Cumulus for almost two years total, from March 2010 until his termination on February 17, 2012. In that position, he managed WJOX (AM and FM), WAPI (AM and FM), WUHT (FM), WZRR (FM), the Paul Finebaum Radio Network, and the Kress Building.  In 2011, Paul Finebaum, who, as referenced earlier, was a key On-Air Talent for Citadel's Birmingham radio network, filed a lawsuit against his employer Citadel and later amended the suit to include claims  against Thomas in his individual capacity.  Thomas was helpful in providing information and resources to show ultimately that Finebaum's suit did not have merit, and Cumulus co-COO John Dickey testified that, although Finebaum asserted claims against Thomas individually, Dickey did not blame Thomas for the Finebaum lawsuit.

3

*Post-Employment Heart Issues*

In September of 2010, Thomas's stress test showed a heart rhythm problem.  Thomas received a diagnosis of ventricular tachycardia (rapid heart beat arising from improper electrical heart activity) and underwent surgery to implant a pacemaker/defibrillator.  Since implantation, the pacemaker has discharged periodically but the defibrillator has never deployed.  Because of the wires in his chest, Thomas had an initial lifting limit of 20 pounds, and the testimony is unclear about how long that lifting limit existed.

*Changes in Birmingham Market*

In 2011, four new radio stations, including one station focused on sports, began operating in Birmingham.  This change meant that the general Birmingham market contained even more competition.  One of the Citadel stations, WJOX, which, as its names suggests, focused on sports, had a direct format and revenue competitor in 2011 that had not existed in 2010.

*Cumulus Acquires Citadel*

On September 16, 2011, about a year-and-a-half after Thomas was hired, Cumulus acquired Citadel, and Thomas became the Defendants' Market Manager in Birmingham.  On November 18, 2011, Cumulus Senior Vice President Gary Lewis visited the Birmingham market and met with Thomas and the Birmingham Sales Manager.  This visit was Lewis's first face-to-face meeting with Thomas. According to Lewis, his conversations with Thomas focused on sales, because other matters, such as the Finebaum litigation and Cumulus's conversion processes, were consuming so much of Thomas's time; Lewis wanted Thomas to stop being overwhelmed by such matters and to re-focus on increasing sales and revenue for the Birmingham market. Lewis has not retained any notes from this meeting, and the record reflects no document sent

from Lewis to Thomas between the meeting and February 6, 2012 listing any directives for him to implement in Birmingham or recapping the matters discussed on that date. The record does not contain any document from Lewis to Dickey and/or Jon Pinch, Cumulus's other co-COO, reporting specifically about the November Birmingham 2011 meeting, although Lewis did refer to the November meeting in a report he prepared in February of 2012.

According to Dickey, Thomas directly reported to Lewis, although Pinch and Dickey were the only Cumulus executives with authority to hire and fire.

*Defendants' Awareness of Thomas's Heart Problems*

On December 21, 2011, Thomas met for approximately 30 minutes with Pinch and John Dickey and discussed the Finebaum litigation. Dickey had met privately with Finebaum that same week and had listened to Finebaum's grievances about the Birmingham situation. Because Finebaum was bringing in over half of the revenue of the Birmingham cluster, his discontent and his lawsuit were the focus of the December 21 meeting. As part of the conversation, Dickey or Pinch asked about how Thomas came to Citadel, and Thomas brought up his health history, advising them that he had suffered a heart attack in 2009 and had undergone cardiac rehabilitation, which affected his start time at Citadel. When Thomas proceeded to say that the Finebaum litigation was causing him stress, but that he was dealing with the stress "pretty well," Pinch responded, *not* in a joking manner, "You're not going to keel over on us, are you?" (Docs. 37-1, at 56, and 41-2, at 8-9). Thomas took the question as a serious, insensitive one, given the "near-death experience" that he had described. He responded, "no, I am trying — I said I'm

watching my health very carefully. . . ."[1] (Doc. 37-1, at 57 p. 222-23).  Although Dickey and

Pinch deny that Thomas discussed his heart condition at the December 2011 meeting, the court

must accept Thomas's testimony for the purposes of summary judgment.

At this meeting, when Thomas pointed out that he had not immediately filled a sales

manager position to save costs, Pinch and Dickey stated that they wanted him to continue to

directly supervise at least one group of salespeople, in addition to the department heads Thomas

already supervised.  Thomas remarked that he had just finished telling them that he needed to

watch his stress level, and now they were giving him additional duties that would add to that

stress level.  However, Pinch responded that Thomas needed to be hands-on with the sales team,

and, given Pinch's previous insensitive remark, Thomas did not object to the additional

supervision duties and did not tell Pinch and Dickey about his recent operation to implant the

heart pacemaker/defibrillator.

*December 26, 2011*

At 12:29 PM on December 26, 2011, five days after Dickey and Pinch had met with

Thomas, Lew Dickey[2] sent John Dickey an email listing twenty-two Facebook friends of Jerry

Del Colliano at Cumulus and Citadel, including the names of Drew Hayes and Bill Thomas; Del

Dolliano was an outspoken critic of Cumulus. At 1:25 PM that same day,  John Dickey

---

[1]Thomas's testimony is not clear what else, if anything, he actually said to Dickey and
Pinch versus what he was thinking at the time.  In response to whether he *answered* Pinch's "keel
over" question, Thomas said, "No, I did.  I said no, I am trying – I said I'm watching my health
very carefully and at this point, you know, I knew that I was getting cardiologist care, I knew I
had a medical device implanted in me, I had a lot of things that were – had happened just, you
know, maybe about a year and two or three months before that meeting, so."  (Doc. 37-1, at 57,
pp. 223).

[2] The Statement of Facts does not reflect the position that Lew Dickey held at Cumulus.

6

responded to the email, stating that "Drew Hayes and [B]ill Thomas will be gone before end of Q1." At 11:25 AM that same day, John and Lew Dickey had exchanged an email thread stating, among other things, "Regional VP - Meier, Bortnick, luchessi, - 15,000   MM - your call.  Don't think we need it."     (Doc. 37-4, at 17).

*Cumulus Decision to Operate WZRR "Commercial Free"*

Sometime during the fourth quarter of 2011, Cumulus made the decision without input from Thomas to operate one of the Birmingham stations, WZRR, "commercial free" during the first quarter of 2012, meaning that station would receive no revenue from commercials during that time period.  The record does not reflect the reasons for that decision.

*Cumulus and the Alleged Post-Merger Consolidation of Markets under RVPs*

 In the months following the September 2011 acquisition of approximately 45 new markets, Cumulus claims to have consolidated several markets under regional vice-presidents (RVPs), eliminating the Market Manager positions in those areas.  According to Defendants, Pinch and John Dickey made the decision in December 2011[3] or January 2012[4] to consolidate the Birmingham and Huntsville markets and to eliminate the Birmingham and Huntsville Market Manager positions, a decision allegedly consistent with a consolidation strategy throughout the Cumulus network.  The Statements of Fact presented to the court in the briefs refer to no written document from Cumulus or Citadel reflecting a general change in the corporate structure to

---

[3] John Dickey testified in his deposition that he and Pinch made the decision at the latest on December 26, 2011, when the decision to terminate Thomas  was referenced in an email, but that the decision may have been made sometime between the first of December and the December 26, 2011 email.

[4] In his affidavit to the EEOC, John Dickey testified that he and Pinch made the decision in December 2011 or January 2012.

regional markets under RVPs.  Neither do the facts presented refer to written corporate documents[5] reflecting a change in the Alabama market management to a regional organization of North Alabama encompassing both cities and managed by an RVP, as opposed to a Birmingham market and a Huntsville market with local Market Managers.

Although Cumulus claims to have consolidated markets under an RVP in Ohio, Michigan, Indiana, the Florida Panhandle, and Louisiana in addition to Alabama, in John Dickey's deposition testimony, he could not name any Market Manager whose position was eliminated because of consolidation of markets.  John Dickey did name one RVP in Louisiana, Susan Lucchesi, whom he claimed took over leadership of the region as a result of consolidation, resulting in the elimination of unnamed market managers in Lafayette and Baton Rouge.  However, information on Cumulus's website[6] indicates that Lucchesi moved to Louisiana from New York in 2007 and that she was given an additional job responsibility in June 2011, more than three months *prior to* the merger with Citadel.

In their briefs, Defendants also identify Drew Hayes as a Cumulus employee whose position was eliminated, implying that he was yet another example of a Market Manager whose position was eliminated because of a general consolidation of markets under a RVP at the end of

---

[5] As noted previously, Cumulus does present an email dated December 26, 2011 with the words "Regional VP- Meier, Bortnick, luchessi, - 15,000  MM - your call.  Don't think we need it."  This document was a casual reference as opposed to a formal document outlining a new company structure, and the email thread does not reflect whether the position of RVP was one already in existence or was merely being contemplated, nor does it reveal whether a decision occurred. (Doc. 37-4, at 17).

[6] Defendants did not object to Plaintiff's presentment of this website information as evidence.

2011 or the beginning of 2012.  However, Thomas produced a news article[7] regarding Hayes's

transfer from his Cumulus position in Chicago to another Cumulus position in Los Angeles,

reflecting that the transfer occurred in 2013, not at the end of 2011 or the beginning of 2012.  The

article referred to the Chicago station's previous owner being taken over by Cumulus in the

previous year.  However, it identified Hayes as a Program Director, not a Market Manager, and it

did not refer to a consolidation of markets under an RVP; rather, it indicated that the person who

would be taking over Hayes's duties would not be an RVP but rather, was Hayes's Assistant

Program Director who later became Program Director of the radio station.

*Lewis Follow-up Visit January 30-February 1, 2012*

Lewis returned to the Birmingham market on a visit from January 30-February 1, 2012.

During that visit, he asked Thomas to articulate what value he had contributed to Cumulus, and

his report on the visit is detailed in a report dated February 6, 2012.

*February 2, 2012 Email from Thomas to Lewis*

On February 2, 2012, Thomas wrote an email to Lewis, responding to Lewis's question

about how Thomas had contributed value to Cumulus.  Thomas began the list of 21 bullet points

with the following statement: "The margin has improved from 31 to 32 percent despite a 35%

ratings drop and a decline in revenue during the Fall."  Thomas pointed out that the Birmingham

market had challenges of  four new competitor stations as well as the Finebaum lawsuit.

Acknowledging a decline in revenues, Thomas's email focused on the ways he had decreased

expenses and increased profitability, hired new talent, and created new events, some promoting

the station and others boosting employee morale.  He also pointed to revenue generated that had

---

[7] Defendants did not object to the presentment of this article as evidence.

increased $7,000 per employee under his watch. (Doc. 37-2, at 116-18).

*February 3, 2012 Email from Pinch to Lewis*

On February 3, 2012, Pinch wrote Lewis with a copy to John Dickey: "Maybe into Birmingham for a change in management.  We can discuss on Monday."  Dickey responded in an email later that day: "john walker April 1 gives us time to backfill Huntsville."  (Doc. 37-6, at 2).

*February 6, 2012 Birmingham Report*

On February 6, 2012, Lewis submitted his "Market Visit Report/Birmingham/Alabama." Although the document reflects that it was prepared by Lewis to send to Thomas, Lewis testified that he never sent it to Thomas, but, instead, sent it first to Pinch and John Dickey for review and revision and that they never approved sending it to Thomas.  According to Cumulus, the reason that the company never sent the report to Thomas is that it had already determined to eliminate his position and consolidate the market under Walker as RVP.

On page two of the report, marked "Confidential," Lewis stated:

> ***The market is in danger of suffering its fourth consecutive quarterly Total Revenue decline, which would be the fifth out of the last six.  If the double digit pacing decline for IQ Local Revenue holds, this would be the seventh decline out of the nine quarters under your stewardship, and more than half of those would be double digit quarterly losses.  All nine quarters would have National outpacing Local, an indication the issues are <u>not</u> ratings based.***

(Doc. 37-8, at 5) (emphasis in original).

Lewis also reviewed sales-focused directives that he claims to have communicated to Thomas and his sales managers in November, such as increased accountability with sales staff, recruitment of sufficient sellers, Thomas's increased involvement in sales, and the bifurcation of sales staff.  In the February report, Lewis voiced his "undisguised dismay" when he found that Thomas had implemented  "so little" of his directives.   (Doc. 37-8, at 4-6).  Lewis also

acknowledged in the report that, as of January 31, 2012, one third of the way through the quarter, the Birmingham market was at 61 percent of its total net revenue budget for the quarter ($1,044,550 net revenue achieved as of January 31 out of a total net revenue budge of $1,700,000).

According to John Dickey, he viewed this report as confirmation of the wisdom of the decision to eliminate Thomas's position, and the information in the report caused him to accelerate the plan to consolidate the Alabama market under Walker as RVP.

*Written Notification of Thomas's Medical Condition*

On Wednesday, February 8, 2012, Thomas visited his cardiologist, Dr. C. Dale Elliott, for a regular check-up. Thomas denied chest pain and shortness of breath, and the exam results were good overall, showing blood pressure and lipids under good control and reflecting that his heart defibrillator device had not discharged since the last check-up. However, according to Thomas, Dr. Elliott advised Thomas to inform his supervisors specifically about his congestive heart failure diagnosis and his need to manage the level of stress at work. The medical chart does not reflect this advice nor does it refer to any discussion regarding managing stress.

On Saturday, February 11, 2012, which Thomas characterizes as the next business day, Thomas sent the following memorandum to John Dickey, Richard Denning, Cumulus General Counsel, and Malea Turner, Cumulus HR Director:

> I need to make you aware of something.
>
> I have been diagnosed with congestive heart failure. The staff of our radio stations is unaware of this diagnosis and I would prefer to keep it confidential, but I felt you should know. The only person at Cumulus-Birmingham who is aware is our local HR person/business manager, Mary Brown. . . . I also have an implantable pacemaker/defibrillator due to

ventricular trachycardia.  Both Mary and Paul [Finebaum] are also aware of
that as well.  Now you are, too.

So far, my condition has not hampered my execution of my job and I
continue to work the necessary hours to accomplish whatever needs to be
done.  My cardiologist is concerned about the stresses of my job in light of
my condition, but I try to manage them as well as possible.

I will be happy to answer any questions you have.  I felt that in the interest
of full disclosure you should be fully aware of my health. . . .

(Doc. 37-2, at 121).  The letter did not refer to any previous discussions with John Dickey and

Pinch about his heart condition.  John Dickey forwarded the message to Jon Pinch with the

notation: "Here we go."  Pinch responded: "Perfect."  (Doc. 37-4, at 25).

Dickey did not respond to Thomas's email, explaining in his deposition that he felt no

need to do so because Thomas indicated that he was fit for his job and that he was not asking for

special accommodation.

On February 12, 2012, Thomas forwarded this email to Mary Brown and asked that she

place it in his personnel file.

*Cumulus's Placement of Walker in Birmingham and Termination of Thomas's Position*

On February 17, 2012, Walker received a phone call from Pinch and John Dickey,

advising him that they would like him "to have regional oversight over both Birmingham and

Huntsville."   When Walker indicated his interest in the position, they asked him to keep the

move confidential, and stated that they were working to find another position in the company in

which to place Thomas.   (Doc. 37-11, at 13 p. 49)*.*  When Walker spoke with Pinch the next

week about compensation for the new position, Pinch advised him that he would be making the

same salary but would be eligible for more money through a bonus program.  Walker received no

documentation about the change in position, other than emails with Gary Lewis working on his start date.

Also on February 17, 2012, Pinch and John Dickey traveled to Birmingham and informed Thomas that they would be running the Birmingham market as part of a regional market under Walker and would be eliminating the Market Manager positions in Birmingham and Huntsville. Although Pinch and Dickey indicated to Thomas that other positions in the company would be available for him, they made no formal offer regarding other positions, and did not discuss terms, compensation, or relocation, or provide any information about any other positions in writing. Pinch and Dickey indicated at that meeting that their focus that day was on the change in Birmingham leadership and the corresponding paperwork.  At the end of the meeting, Thomas asked whether Dickey had received his letter about his heart condition, and Dickey responded: "oh yeah, yeah, yeah, we all have problems as we get older, I have gout."  (Doc. 37-1, at 81).

On February 20, 2012,  Thomas attempted to follow up with John Dickey about his transferring to another position at Cumulus and information about other positions.  Thomas told Dickey that he was open to any Cumulus opportunities, and asked for more specific information regarding the Montgomery, Nashville, and Columbia positions Dickey had referenced.  Dickey provided no  specific information such as the salary, the timetable, or the relocation information about any other position.  Rather, without providing any specifics, Dickey told Thomas: "if you are not prepared to tell us, if you are not prepared to take one of these jobs or trust us ... to put together something that will work for you after you're out of the building, then we need for you to sign [termination] paperwork."  (Doc. 37-1, at 328).  As a result of the vague response and the focus on getting the exit paperwork signed, Thomas did not understand that Cumulus had made

any legitimate job offer.  Thomas testified that the Columbia Market Manager position, for example, was not truly open because the same person who held that position when Thomas was terminated in February of 2012 still held that position at the time of his deposition in 2014.

In John Dickey's deposition testimony, he stated that he had offered Thomas a position in Nashville to start a news network, which was a programming-heavy job, as well as a Market Manager position in Columbia, and that Thomas declined those jobs.

After the position change, Walker spends 96% of his work time in Birmingham and has an apartment there but continues to live in Huntsville.  Although he retains the title of Market Manager over Huntsville, Cumulus has hired a vice-president of sales in Huntsville, who performs some of the functions that Walker used to do when he worked exclusively in Huntsville.  Since the change in February 2012, Walker's bonus is based on the performance of the Alabama markets, and is not limited to the Birmingham market but also includes Huntsville and, more recently, Montgomery.

Thomas disputes that consolidation resulted in the establishment of a RVP position that controlled Birmingham and Huntsville and eliminated his own market manager job; he insists that Cumulus in effect replaced him with Walker as the new Birmingham Market Manager.   The February 3, 2012 emails between Pinch, John Dickey, and Lewis provide some support for Thomas's position.  Pinch wrote: "Maybe into Birmingham for a change in management."  John Dickey responded: "John [W]alker April 1 gives us time to backfill Huntsville."  (Doc. 37-4, at 23).  The email chain does not characterize Walker's proposed new position as regional or as a promotion or a consolidation of Huntsville and Birmingham.

14

*Cumulus's Explanation for Choosing Walker over Thomas*

John Dickey's testimony about the choice for RVP contained inconsistencies.  In his EEOC affidavit dated February 25, 2013, Dickey stated: "Of course, we considered both Market Managers for this promotion [to RVP].  Between Bill and John Walker, the former Market Manager for the Huntsville market, the choice for RVP was clear.  John Walker's sales and performance were a stark contrast to Bill's poor results in Birmingham.  Bottom line — Huntsville was making money under John Walker's management, and Birmingham was losing money under Bill."  (Doc. 41-6, at 5).  However, in Dickey's deposition testimony, when asked whether he considered Thomas for the Regional Vice-President position, Dickey originally testified: "I don't recall considering Bill . . . ." (Doc. 37-3, at 8 p. 26).  He later testified in the same deposition, after a break, that the decision to consolidate markets was made in December of 2011 and "looking at the decision matrix in front of us, which was we could opt to go with Bill or we could opt to go with John Walker over that job, yes, the answer to your question is Bill was looked at, his performance was looked at, his background was considered ... and the decision was made, I think for the right reason, to go with John Walker."  (Doc. 37-3, at 40 p. 154).  As discussed subsequently, disputed evidence exists that the Birmingham market numbers reflect a 4.4% decline in 2011 revenues compared to a 9.4% decline in Huntsville, contradicting Dickey's testimony.

In any event, Dickey and Pinch explained their choice of Walker as based upon Walker's sales ability, reflected in the Huntsville market's local revenue growth outperforming

Birmingham's as well as his richer sales background. [8]

<em>Sales Background of Each Candidate</em>

One reason Cumulus provided for choosing Walker over Thomas is that John Dickey and Pinch felt that the Birmingham market needed improvement in the sales area, and they viewed Walker as having a stronger *sales* background than Thomas; Dickey characterized Thomas as a well-rounded broadcaster with a strong *programming* background.

Walker's background in sales included working as a shoe salesman in 1986-88, as a department store Area Sales and Operations Manager in 1988-96, as a radio sales representative from 1996-99, as a Senior Account Manager and Regional Sales Manager in radio sales from 1999-2003, as Director of Sales for Clear Channel from 2004-06, and then he began working as a Cumulus Market Manager.

Thomas began his career in radio in high school and the first twenty years of his work life appeared to be primarily focused on programming.  From 1974-78, he worked with a radio station as Assistant Program Dirctor and On-Air Talent; from 1978-82, he worked with Harte-Hanks Communications as Program Director and Regional Program Director; from 1982-85, he served as program manager for a radio station; from 1985-90, he served as Senior Vice-President/Programming for Capital Broadcasting; and from 1990-92, he was partner/co-owner of StorySongs Partners.   Thomas presented evidence that he had met John Dickey when Thomas was CEO of Ameron Broadcasting from 1992-1997 and that his CEO functions included sales

---

[8] Although the Defendants' briefs refer to Birmingham market as one mired in conflict, pointing to the Finebaum litigation and controversies and grumbling over a change in the sales commission structure, Defendants do not list the Finebaum litigation and other dissension in the Birmingham ranks as a reason for Thomas's adverse employment action.  As noted earlier, John Dickey specifically acknowledged that he did not blame Thomas for the Finebaum lawsuit.

management during that tenure. During the years 1997-2000, he served as VP/Market Manager for Capstar Broadcasting and then for AMFM, Inc.  Thomas also quarrels with Defendants' characterization of his position with SharePoint Management during the years 2000-04 and 2008-10 as "Programming Consultant," stating that he consulted on all phases of the radio broadcast business, including sales.  In his deposition testimony, however, Thomas did acknowledge that the consulting firm initially focused primarily on programming because he "was coming at that point off of a BP programming role," but stated that the consulting expanded into other things such as television production.  (Doc. 37-1, at 10, pp34-35).

<em>Revenue</em>

The parties dispute whether profit or revenue is the appropriate measure of success of a local market.  Thomas asserts that the appropriate measure is the local market's *profit*, taking into account not only revenues but also expenses.  Citadel's assessment of Market Managers' success was based on "annual broadcast cash flow results, i.e., the total revenue less total expenses." (Doc. 41-1, at 4).  Under Citadel's employ, Thomas received a raise after one year, a bonus in early 2011 for calendar year 2010 in the amount of $39,375.00, and a bonus in the amount of $28,384 for the calendar year 2011, prorated to the date of the merger.

As to Cumulus's assessment of Market Managers, Cumulus provided uneven testimony regarding whether the assessment is based primarily on revenue or whether profit also provides a key focus. The job description of Cumulus Market Managers refers to the development not only of revenue but also expense budgets.  Dickey's affidavit to the EEOC in February of 2013 stated that the choice about whom to choose for the RVP position was "essentially a financial decision – who can best manage a market to deliver the most *profit*." (Doc. 41-6, at 3 ¶ 6) (emphasis

17

added).  By contrast, in Dickey's deposition, he indicated that the duty of  Market Managers is not to focus primarily on profit but, rather, to increase *revenue*, as "they have very little control over expenses, which are primarily controlled by Cumulus's corporate office."  (Doc.  37-3, at 16-17, pp. 63-65).

Defendants point to bonus criteria to support their argument that revenue and not cash flow results was the primary focus for evaluating Cumulus Market Managers and RVP candidates.  They acknowledge that in 2006, the focus for Cumulus bonus awards was on cash flow results, which would take into account market revenue less market expenses. They claim, however, that the focus changed in 2008, when bonus calculations changed so that cash flow was only one-third of the calculation and two-thirds was based on revenue.  Defendants further claim that in 2011, the bonus calculation changed again so that it was based on three goals, with each goal paying 33% of the quarterly bonus: "(1) budgeted Quarterly Net Revenue;  (2) budgeted Quarterly BCF [presumably broadcast cash flow]; and (3) exceeding 2010 net revenue for the quarter by 10%."   Defendants produced an email dated January 25, 2011 and listing "MM" as recipients, listing the above goals.

However, Defendants assert that Cumulus used these three goals to evaluate Cumulus Market Managers for *bonuses,* but that they did *not* use these three goals to evaluate Thomas and Walker for the *RVP position*.  Rather, they claim that Pinch and Dickey were evaluating the candidates based on ability to grow local revenue and did not look at "net" figures.

Although Thomas disagrees that revenue is the primary measure that Defendants used to evaluate Market Managers, he proffers evidence that even under a revenue-based evaluation, his Birmingham market performed better than the Huntsville market.  Defendants state that the

18

Birmingham market had double-digit declines under Thomas's leadership.  Thomas disputes that evidence in his affidavit, testifying that "[r]evenue performance in all radio markets in 2011 was waning due to economic climate" but nevertheless showing that the Birmingham market had a 6.1% increase in revenues in 2010, a double-digit increase in cash flow for the first quarter of 2011, and, as of September 13, 2011 about the time of the merger with Cumulus, it had booked in excess of $800,000 for September.  His numbers from preparing the proposed 2012 budget in November of 2011 based on the November 2011 Quarterly Analysis showed a total revenue for the third quarter of 2011 as $2,393,104, which is not consistent with the Cumulus Profit and Loss Reports for 2011 showing a total revenue as $1,973,786, which is $472,323 less than the actual number  reflected in the November 2011 Quarterly Analysis.

According to Thomas's information based on what he calls the "corrected" numbers, the Birmingham market ended the year with a 4.4% decline in revenues in 2011 whereas the Huntsville market under Walker had a 9.4% decline in revenues in 2011.  Citadel CEO Ellis supported Thomas's testimony regarding the Birmingham market's 2011 performance through mid-September, attaching to her affidavit a Citadel pacing report for the year 2011 through September 13, 2011.

According to Defendants, the only criteria Pinch and John Dickey considered in choosing a Market Manager was revenue growth.  They point to figures showing that the Huntsville market's total local revenue in 2011 as compared to 2010 was down in the first quarter but up in the second and third based upon the tremendous performance of that market in May (up over $113,000) and August (up over $130,000) compared to the previous year.  They also point to figures showing that the total local revenue in October and November of 2011 was up over the

prior year.  Further, Defendants state that even under Ellis's pacing data for 2011, total local revenue was down in July, August, and September as compared to 2000, so looking at the numbers through the lens of revenue growth, Birmingham was down compared to the year before.

Thomas testifies that sometime in late January of 2012, Cumulus retroactively charged the Finebaum legal expenses to the Birmingham market, reducing its broadcast cash flow by $456,059.  As noted above, the Citadel pacing report dated September 13, 2011 shows more than $800,000 already booked for that month, and yet, the Birmingham September 2011 monthly revenue reflected in Cumulus's Profit and Loss Report totals only $528,760.  Thomas testified that the Cumulus numbers make no sense given the mid-September pacing report and given the high revenues from football game broadcasts unless the Finebaum legal expenses or some other significant expenses were retroactively charged against it.  As Market Manager of the Birmingham market, Thomas was aware that in late January of 2012, Cumulus adjusted the Birmingham market Profit and Loss Statements for 2011 to charge against that market the Finebaum legal expenses.   However, Thomas testified that the Citadel policy in place in 2011 was that the Finebaum litigation expenses were a corporate expense that would not be charged to the Birmingham market, and he produced a September 9, 2011 email from the Citadel Vice-President-Operations Controller confirming that policy.  Further, even in the "incorrect" Profit and Loss Reports, Birmingham's 2011 *annual* revenue was -7.8% as compared with Huntsville's -9.4%.

In supporting the choice of Walker in December of 2011, Cumulus relied on the 2010 and 2011 Profit and Loss statements, including the Birmingham statements to which Thomas pointed

as retroactively changed in 2012. If that change occurred in 2012, Pinch and Dickey could not have relied upon the changed numbers in December of 2011.  Those Cumulus statements look at revenue by quarter and show, that, as compared to 2010, Huntsville's total local revenue for 2011 was down in the first quarter but up in the second and third, and up in October and November, whereas Birmingham's total local revenue was down in the first three quarters of 2011 and down as well in October and November of 2011.

Thomas also pointed to another Cumulus move as skewing the Birmingham market numbers: the decision for WZZR to go commercial free beginning January 2012, which means it would not be bringing in any revenue from commercials during that period.

*Other Medical Information*

The check-up with cardiologist Dr. Alfred Stanley on May 16, 2012 reflected that Thomas had a fainting spell three months before the check-up, after ingesting his blood pressure medication.  However, the medical record reflected "no shocks or ATP" (anti-tachycardia pacing, which are low energy impulses to promote a normal heartbeat) based on questioning Thomas and on checking his pacemaker,which confirmed no electrical event. The medical chart stated: "Patient's functional capacity is normal.  He works in his home, around the yard, walks 2-3 miles a day all without angina, dyspnea, and appropriate fatigue." (Doc. 37-2, at 38-41).

In Dr. Dale Elliott's affidavit, he stated that he is a treating physician for Thomas, having previously performed angioplasty on Thomas and inserted stents in his heart arteries.  Dr. Elliott testified that Thomas has received a diagnosis of congestive heart failure in addition to his ventricular tachycardia, and that, because of those diagnoses, "he needs to avoid high stress levels [which] can make heart failure worse."  (Doc. 41-3, at 2).

## **LEGAL STANDARD**

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)  Substantive law determines which facts are

22

material and which are irrelevant.  *Id.* at 248.  In responding to a motion for summary judgment,

the non-moving party "must do more than simply show that there is some metaphysical doubt as

to the material fact."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by

the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P.

56(e)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28

U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to

assess the proof in order to see whether there is a genuine need for trial.").  "The non-moving

party need not present evidence in a form admissible at trial; however, he may not merely rest on

his pleadings."  *Graham v. State Farm Mut. Ins.* Co., 193 F.3d 1274, 1282 (11th Cir. 1999)

(citing *Celotex,* 477 U.S. at 324).  If he does, or if the evidence is "merely colorable, or is not

significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50

(citations omitted).

      In reviewing the evidence submitted, the court must "view the evidence presented

through the prism of the substantive evidentiary burden," to determine whether the nonmoving

party presented sufficient evidence on which a jury could reasonably find for the nonmoving

party.  *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir.

1988).  The court must refrain from weighing the evidence and making credibility

determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S.

at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v.

State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  Furthermore, all evidence and

inferences drawn from the underlying facts must be viewed in the light most favorable to the

non-moving party. *Graham*, 193 F.3d at 1282. The non-moving party "need not be given the

benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-

moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor."

*Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment,

the court must deny the motion *if* genuine issues of material fact exist or *if* the moving party is

not entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

Even if a district court "'believes that the evidence presented by one side is of doubtful

veracity, it is not proper to grant summary judgment on the basis of credibility choices.'"

*Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (*quoting Miller v.*

*Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)). The court should not disregard self-serving

statements made in sworn testimony simply because they are self-serving at the summary

judgment stage, and if the self-serving statements create a genuine issue of material fact, the

court should deny summary judgment on that basis. *Id.* at 1253.

## DISCUSSION

Defendants assert that Thomas's claim, brought under the Americans with Disabilities

Act, fails as a matter of law, and thus, that summary judgment is due in their favor. The ADA

prohibits discrimination by an employer "against a qualified individual on the basis of a disability

in regard to [any] terms, conditions, [or] privileges of employment." 42 U.S.C.A. § 12112(a). A

"qualified individual" is "an individual who, with or without reasonable accommodation, can

perform the essential functions of the employment position that such individual holds or desires."

*Id.* at § 1211(8).

Where no direct evidence of discrimination exists, as in this case, the court first analyzes an ADA case under the *McDonnell Douglas* burden-shifting framework. *See Cleveland v. Home Shopping Network, Inc*., 369 F.3d 1189, 1192 (11th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). To establish a *prima facie* case under the ADA as amended by the ADAAA, a plaintiff must show that he had a disability, that he was a qualified individual, and that his employer subjected him to unlawful discrimination because of his disability. *See Mazzeo v. Color Resolutions Inter., LLC,* 746 F.3d 1264, 1268 (11th Cir. 2014). If the plaintiff establishes his *prima facie* case, the defendant must articulate a legitimate, non-discriminatory reason for the employment action, and if it does so, the plaintiff has the burden to establish that each reason is "unworthy of credence" and was a pretext for disability discrimination. *Cleveland,* 369 F.3d at 1193. However, the Eleventh Circuit has cautioned that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011). Where a plaintiff is able to present "'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker,'" the plaintiff will nevertheless defeat summary judgment. *Id.* (quoting *Silverman v. Bd. of Educ. of City of Chicago,* 637 F.3d 729, 733-34 (7th Cir. 2011)).

*Prima facie* Case under the <u>McDonnell Douglas</u> Framework

Substantial Limitation of any Major Life Activity

The first element of Thomas's *prima facie* case under the ADA is establishing that he is disabled under the ADA. The ADA, as amended, defines "disability" as "(1) a physical or

mental impairment that 'substantially limits one or more' of an individual's 'major life activities,' (2) a 'record of such an impairment,' or (3) 'being regarded as having such an impairment' as described in subsection (1)." *Mazzeo,* 746 F.3d at 1268 (quoting 42 U.S.C. § 12102(1)).   When Congress enacted the ADAAA in 2008, amending the ADA, it stated that one of its purposes was to "convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." 42 U.S.C. § 12101 note.  It "expect[ed] that the [ADAAA] will lessen the standard of establishing whether an individual has a disability for purposes of coverage under the ADA." H.R. Rep. No. 110-730, at 9 (2008).  The amendment changed, among other things, the definition of the term "disability" to include *being regarded as having an impairment,* and a person may satisfy the "regarded as" prong if the person has been subjected to a prohibited action "because of an actual or perceived ... impairment," even if the impairment does not limit or is not perceived to limit a major life activity. 42 U.S.C. § 12102(3).

Defendants assert that, although Thomas has established that he has an impairment, his heart condition, he has not established that it substantially limits a major life activity.  The ADA states that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working" and "also include[] the operation of a major bodily function, including but not limited to, functions of the ... circulatory ... functions." 42 U.S.C. § 12102(2) (A) & (B).  Federal regulations explain that the term "major bodily functions" includes the cardiovascular system and also includes the operation of an individual organ within a body system. *See* 29 C.F.R. §1630.2(i) (1)-(2).   A person may

have a disability even if he has an impairment that substantially limits only one major life activity.

Thomas has established that he suffers from congestive heart failure and ventricular trachycardia that required the implantation of a pacemaker and defibrillator.  He has also testified, although he has no specific medical record or affidavit to support the testimony, that his heart functions at 40% capacity and that the condition and the devices in his body placed limits, at least initially, on the amount of pounds he could lift.  In any case, the court finds that the medical testimony, including the congestive heart failure diagnosis, is consistent with a substantial impairment of a major life activity, i.e., the function of the heart and cardio-vascular system.  In arguing that Thomas's heart condition does not substantially affect a major life activity, Defendants cite no cases decided after the enactment of the ADAAA, with its broadened definition of the term "disabled," and the court is aware of no controlling caselaw that supports Defendants' position in light of the ADAAA.

Further, evidence exists that in December of 2011 Thomas told the co-Chief Operating Officers of Cumulus about his previous heart attack and rehab, and that Pinch responded: "You're not going to keel over on us, are you?"  Thomas testified that Pinch's response was not relayed in a joking manner.  Pinch is one of he decisionmakers for the employment decision in question.  This testimony raises a genuine issue of material fact that Cumulus supervisors "regarded" Thomas as disabled.

Accordingly, the court FINDS that Thomas meets the first element of his *prima facie* case.

Causation

Defendants do not challenge the second element of the *prima facie* case, that Thomas was qualified for his position; they next argue that Thomas cannot establish that his position was eliminated and that he did not receive the RVP position *because of* his disability.

The court disagrees.  While temporal proximity between notification of a health condition and an adverse employment decision does not always establish causation, very close temporal proximity may establish a causal connection under certain circumstances.  *See Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (Title VII retaliation case noting that in a case where plaintiffs attempt to establish causation through temporal proximity, "the temporal proximity must be 'very close'" (quoting *O'Neal v. Ferguson Constr. Co.,* 237 F.3d 1248, 1253 (10th Cir. 2001)); *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir. 2007) (Title VII retaliation case stating that "[t]he burden of causation can be met by showing close temporal proximity" between notice [here of protected activity] and the adverse employment action); *Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1337 (11th Cir. 1999) (ADA retaliation case holding that a seven-week gap between notice of protected action and adverse action was sufficiently close to establish a causal connection); *Gilliard v. Ga. Dep't of Corrections,* 500 F. App'x 860, 869 (11th Cir. 2012) (ADA retaliation case noting the "general rule that close temporal proximity between the protected activity and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of fact as to causation, except ... where it is unrebutted that the decision maker did not have knowledge," citing *Brungart v. BellSouth Telecomms., Inc.,* 231 F.3d 791, 799 (11th Cir. 2000)). Although the court does not hold these cases out as being "on all fours" with this case because they either are not ADA cases

28

or are ADA *retaliation* cases, they nevertheless stand for the proposition that evidence of very close temporal proximity between employer notice and the adverse employment decision is relevant, material evidence as to causation.

In the instant case, *five days* elapsed between the date Thomas testified that he first notified Pinch and John Dickey of his heart condition and the date of the first email from those decisionmakers documenting a decision to terminate Thomas's employment, setting the proposed termination date sometime before the end of the first quarter of 2012.   Then, *nine days* elapsed between the date of Thomas's letter formally notifying Cumulus of his heart condition with specific diagnoses and the date Pinch and Dickey officially eliminated Thomas's Market Manager position and chose another RVP over Alabama markets, accelerating the termination date the two COOs had originally discussed.  The court finds that the timing between notification and the adverse employment decision to be "very close" indeed.

Defendants argue that Thomas has not established the element of causation because they had insufficient notification of Thomas's condition to put them on notice of his alleged disability. Although Thomas testified that Pinch and Dickey were aware as of December 21, 2011 that Thomas had had a heart attack and resulting rehab, they received no specific notice that Thomas had diagnoses of congestive heart failure and  ventricular tachycardia until his letter in mid-February of 2012.  To support their argument about a lack of causation, Defendants again cite cases decided *before* the ADAAA and the expansion of the definition of disability under the ADA.   However, the key is not whether Pinch and Dickey had notice of all the specifics of Thomas's heart condition before they made the decision to terminate his position, but rather, whether they had notice of enough information that they at least *regarded him* as disabled.

29

Pinch's response to Thomas's statement about his heart attack and rehab raises a genuine issue of material fact that Defendants so regarded him in December of 2011.

The very close temporal proximity between the employer's notice of Thomas's heart condition and the decision to terminate him (five days), and the very close temporal proximity between the letter giving more specifics about the heart condition and the decision to accelerate the elimination of his position (nine days), *plus* Pinch's reaction to the news of his heart condition all combine to create a genuine issue of material fact regarding whether the decision to eliminate his position and place Walker in the RVP job was made "because of" Thomas's heart condition. The other contradictions and incoherencies in Defendants' reasons for the decision, discussed in detail in the *pretext* section of this opinion, would also provide further support for the court's finding that Thomas has raised genuine issues of fact as to *causation*. Accordingly, the court FINDS that Thomas has met all elements of his *prima facie* case.

*Legitimate, Non-discriminatory Reason for the Employment Action*

In their briefs, Defendants state that the adverse employment action occurred because, after the merger with/takeover of Citadel, Cumulus reorganized its markets across the country under regional vice-presidents and eliminated Market Manager positions under those RVPs. In Alabama, according to their explanation, that reorganization resulted in a new RVP position over all Alabama markets and the elimination of Market Manager positions in the Birmingham and Huntsville markets. Defendants claim to have considered both Alabama Market Managers for the new RVP position and to have chosen Walker over Thomas for two reasons: (1) he demonstrated a better ability in 2011 to grow local revenue in his market; and (2) his sales background was best suited to the revenue production needs in the Birmingham market. (Defs.'

30

Br. Doc. 36, at 29-30).

The court agrees that Defendants have articulated a legitimate, non-discriminatory reason for their employment decision.  Accordingly, the court will proceed to analyze the argument that the reason given was a pretext for discrimination.

Pretext

Defendants present the pretext issue as one requiring the court to address their reasons for choosing Walker over Thomas for the RVP promotion and determining whether inconsistencies and incoherencies exist in their explanation.  However, in so arguing, Defendants have skipped a step.  This fact scenario is not the usual one where two or more candidates have applied for a promotion and the unsuccessful candidates screams foul.  In fact, neither Thomas nor the successful candidate, Walker, applied for the RVP position, because neither knew that the RVP position existed nor that Cumulus was eliminating their former positions until the day on February 17, 2012 when the RVP position was bestowed upon Walker.  Rather, Defendants' explanation requires the court first to accept what Thomas characterizes as *disputed* facts: that Cumulus was reorganizing former Citadel markets under RVPs with resulting elimination of Market Manager positions, and that the reorganization was not limited to Alabama and the elimination of Thomas's Market Manager position.  In analyzing pretext, then, the court will need first to address these inter-related issues, which form the foundation for Defendants' explanation(s) of the adverse employment action.

Thomas raises a genuine issue of material fact that the "reorganization" was a pretext for discrimination by arguing that Cumulus only reorganized the Alabama market and eliminated one job— i.e., Thomas's position—when it claimed to be doing a broader reorganization. John

31

Dickey testified in his deposition that, after the Citadel merger,  Cumulus consolidated markets under a Regional Vice-President not only in Alabama but also in Ohio, Michigan, Indiana, the Florida Panhandle, and Louisiana, "and other areas,"[9] resulting in the elimination of Market Manager positions under the Regional Vice-President.  However, as Thomas points out, when Dickey was asked in his deposition for specific information to support that testimony regarding those areas, such as the names of Market Managers whom Cumulus terminated or the names of Regional Vice-Presidents who received that position after the Citadel acquisition, Dickey first responded that he did not recall any specifics.  Later in the deposition, Dickey testified that Susan Lucchesi was the Louisiana RVP who gained that position after the Cumulus acquisition, and Drew Hayes was the Chicago Market Manager whose position was eliminated as a result of the acquisition.

However, Thomas presented evidence indicating that the timing and circumstances of these employment decisions did not line up with the Citadel acquisition.  Lucchesi apparently last received additional Cumulus work duties months *before* the Citadel acquisition.  Thomas also presented a news article stating that Hayes held the position of Program Director, not Market Manager; that he left Chicago over a year *after* the Citadel acquisition; and that his Assistant Program Director succeeded him as Program Director, not an RVP.  Accordingly, Thomas has provided evidence that the few specific names that Cumulus presented as examples of other

---

[9] The Defendants' Statement of Facts does not mention specifically but John Dickey also referenced in his deposition the Los Angeles, California market.  Dickey testified that Cumulus eliminated Bob Moore's Market Manager position and replaced him with Marco Radvowick.  (J. Dickey Dep. Doc. 37-3, at 10).  Because the Defendants' Statement of Facts did not specifically mention the Los Angeles market, Thomas did not address that Market Manager position in his response.

RVPs created and Market Managers dropped as a result of the Citadel acquisition do not hold up, which raises issues for the jury: if Defendants cannot name a single example of an RVP created outside Alabama and of a Market Manager position eliminated except for Thomas's position, does this void mean that no such reorganization and consolidation truly existed and that the elimination of Thomas's position in Alabama was a pretext for discrimination?

Cumulus's lack of specificity does not end at the inability to recall specific names of those gaining or losing job positions because of any "consolidation," but also extends to a curious absence of official Cumulus documents detailing changes and documenting that the changes were as a result of the consolidation with Citadel.  If Cumulus truly had a reorganization of at least six regional areas after acquiring Citadel, logic suggests that some Cumulus document would detail that reorganization or refer to it in some formal or semi-formal way.  However, the facts presented to the court refer to no written document from Cumulus after the Citadel acquisition reflecting a general organizational change in the company's structure to regional markets under RVPs.  Neither do the facts presented refer to written corporate documents reflecting a change in the Alabama market management to a regional organization of North Alabama encompassing both cities and managed by an RVP, as opposed to a Birmingham market and a Huntsville market with local Market Managers.

The Defendants pointed to only an informal email that simply uses the words " "Regional VP - Meier, Bortnick, luchessi ...."   Given that Lucchesi was apparently working in Louisiana, that email may provide some thin support for the argument that the company was at least considering establishing an RVP in Louisiana, but the email thread, casual and oblique at best, reaches no conclusion.  The emails specifically referring to Thomas and Walker (December 26,

2011 and February 2012) are curiously silent about the "change in management" involving Thomas's Birmingham position having anything to do with reorganization under an RVP, as Cumulus suggests. Indeed, prior to February 17, 2012, the date of the termination of Thomas and "promotion" of Walker to RVP, Cumulus had not even advised Thomas and Walker that the company was considering such a structural change, had not requested their input, or given them an opportunity to apply for the RVP position. Instead, Pinch and John Dickey unveiled the Alabama structural change, the elimination of Market Manager positions, and the choice of Walker all on the same day as a fait accompli. While that type of corporate high-handedness is not necessarily grounded in discrimination, the secrecy, curious lack of documentation of the "reorganization," and the inconsistencies among the testimonies of Cumulus personnel and Cumulus documents, all combine to raise a question for the jury regarding whether Cumulus was indeed reorganizing the Alabama Market as part of larger corporate plan to consolidate and absorb Citadel markets in multiple regions, or whether Cumulus was using "consolidation" in the Alabama market as a pretext to terminate Thomas. Put another way, a jury issue exists whether Cumulus was truly establishing a Regional VP position in Alabama *or* was simply terminating Thomas because of his heart condition, replacing him with Walker, and calling the move a consolidation to cover-up a targeted termination.

In light of that ruling on the "skipped step," a jury issue exists on Defendants' foundational premise of establishing a new RVP position in a new Alabama regional market—a foundational premise undergirding *all* of Defendants' reasons for Thomas's adverse employment action. Thus, the court need not proceed to address this employment decision as if it were a standard promotion decision weighing two applicants. However, even assuming *arguendo* that

34

the court were to address the employment decision further, the court acknowledges Thomas's argument that Cumulus had pre-selected Walker and, to justify that decision, arbitrarily narrowed the qualifications for the position to ensure that Walker fit it.  For example, Thomas argues that comparing the profit/net revenue for the Huntsville office under Walker versus the profit/net revenue of the Birmingham office during Thomas's tenure (March 2010 through 2011 or through the first quarter of 2012) would have resulted in Birmingham coming out on top, so Cumulus was forced to arbitrarily limit the comparison to a specific area where Walker could win.  In a secret selection that it did not announce before-the-fact to either candidate, Cumulus afterwards explained that it made the selection by looking only at revenue *growth* during 2011: one year that revenue growth was virtually impossible in Birmingham because four new competitor radio stations had entered that market but not Huntsville's.  That very narrow focus smacks of justification for pre-selection, and Thomas provides the following evidence that raises inconsistencies and incoherencies with Cumulus's position that the narrow focus on revenue growth for 2011 was a reasonable measure and that it was not targeting Thomas for termination: (1) Citadel records showing different financial figures than Cumulus figures for 2011 for the Birmingham market, supporting the argument that Cumulus was manipulating the figures to support ouster of Thomas; (2) Citadel's decision not to charge 2011 legal fees from the Finebaum litigation to the Birmingham market expenses, but Cumulus's decision to do so retroactively, which could be seen as manipulation of the Birmingham 2011 financial figures; (3) Cumulus's identifying December of 2011 as the date of the decision to terminate Thomas's position, which was before the retroactive application of the Finebaum litigation expenses, and thus, was a date when the Birmingham market numbers compared favorably with the Huntsville market numbers;

35

(4) Cumulus's insistence that the decisionmakers evaluated Thomas and Walker by looking at growing revenue and ignoring profit, when other Cumulus information focuses on profit and net revenue when evaluating Market Managers: a) Dickey's affidavit to the EEOC stating that the choice of Market Manger is based on "who can best manage a market to deliver the most *profit*" (Doc. 41-6, at 3, emphasis added), and b) the bonus plans for  Cumulus Market Managers containing a *profit* and *net* revenue component; (5) the emergence of four new radio stations as competition in Birmingham in 2011, a circumstance rendering the comparison of the Birmingham market with almost any other market a negative one as a foregone conclusion, when that comparison was based solely on revenue *growth* for 2011 and forward; (6) Cumulus's decision to run one of its Birmingham stations without commercials in the first quarter of 2012, which would contradict its position that revenue *growth* in the Birmingham market was its primary aim; and (7) Lewis's failure to put into writing to Thomas any expectations or goals to give him an opportunity to meet those expectations or goals prior to termination, indicating that termination of Thomas may have been a foregone conclusion.  The court finds that all of these contradictions and inconsistencies further support the finding of a genuine issues of material fact as to pretext.

The court acknowledges the Defendants' argument that they have listed two reasons for choosing Walker over Thomas for the RVP position—Walker's ability to *grow* revenue and his greater experience in sales—and that Thomas has failed to address head-on these two reasons and rebut each of them as pretext.  The court disagrees, reiterating that Thomas has established the existence of a jury issue as to the foundational premise upon which *both* of these reasons are based and also finding that Defendants' focus on revenue growth means that these reasons are

inter-related.

The court acknowledges that the "convincing mosaic" of circumstantial evidence set out in *Smith v. Lockheed-Martin Corporation* represents yet another way for Thomas to attempt to defeat the Defendants' motion for summary judgment.  However, in light of the ruling that Thomas has defeated the motion under the *McDonnell Douglas* framework, the court need not address this alternative means.

For all of these reasons, the court FINDS that the Defendants' motion for summary judgment is due to be DENIED.  This case will proceed to pre-trial and trial on the only remaining claim in Count I, the claim for disability discrimination in violation of the ADA as amended by the ADAAA.

Dated this 19th day of December, 2014.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE